## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

FREDERICK DELANO and FRANCES DELANO,

Plaintiffs,

v.

CIVIL ACTION
CASE NO. 2:11-cv-02475-WGY

ABBOTT LABORATORIES,

Defendant.

## MEMORANDUM

## I. INTRODUCTION

Frederick and Frances Delano (collectively, the "Delanos")
initiated a product liability action against Abbott Laboratories
("Abbott"). The Delanos allege that Frederick Delano ("Delano")
was injured by Abbott's failure to warn about the increased risk
of acquiring histoplasmosis, a fungal infection, when Abbott's
drug Humira is administered with a complimentary drug in the
Mississippi valley, a region with high exposure to the
histoplasma fungus. Abbott has moved for summary judgment,
arguing that the Delanos' product liability claims are time-
barred, while the Delanos claim that Abbott waived the
limitations period on their claims.

### A. Procedural Posture

The Delanos brought suit against Abbott on June 12, 2011, alleging strict liability, negligence, and breach of warranty claims. Compl. ¶¶ 81-86, ECF No. 1. On September 6, 2011, Abbott moved for summary judgment. Def. Abbott Labs.' Notice Mot. Summ. J. ("Abbott Mot. Summ. J."), ECF No. 9. At the same time, Abbott filed an unopposed motion for extension of time to file an answer in light of its motion for summary judgment. Def. Abbott Labs.' Unopposed Mot. Extension Time File Responsive Pleading, ECF No. 12. The Court granted the extension. Order Granting Def. Abbott Labs.' Unopposed Mot. Extension Time File Responsive Pleading, ECF No. 16. The parties then fully briefed the motion for summary judgment. Abbott Mot. Summ. J., Attach. 1, Mem. Supp. Def.'s Mot. Summ. J. ("Abbott Mem."), ECF No. 9-1; Pls.' Resp. Opp'n Abbott's Mot. Summ. J., Attach 2, Pls.' Mem. Supp. Resp. Opp'n Abbott's Mot. Summ. J. ("Pls.' Mem."), ECF No. 24-2; Reply Br. Supp. Def.'s Mot. Summ. J. ("Reply"), ECF No. 32. Abbott submitted a statement of undisputed facts, Abbott's Mot. Summ. J., Attach. 2, Statement Undisputed Facts Supp. Def.'s Mot. Summ. J. ("Def.'s Facts"), ECF No. 9-2, to which the Delanos responded, Pls.' Resp. Abbott's Statement Ostensibly Undisputed Facts & Statement Add'l Undisputed Facts ("Pls.' Facts"), ECF No. 25, and Abbott filed a response to the Delanos' facts, Reply, Attach. 1, Def. Abbott Labs.' Resp. Pls.' Statement Add'l Undisputed Facts, ECF No. 32-1.

2

On January 19, 2012, the Delanos filed a motion to dismiss
without prejudice, requesting that they be permitted to proceed
with the case in a parallel suit in an Illinois state court.
Pls.' Mot. Dismiss Without Prejudice, ECF No. 37.  The Delanos
filed an amended motion to dismiss on June 7, 2012, noting that
their action could be consolidated with seventeen other Humira-
related cases against Abbott in Illinois.  Pls.' Am. Mot. Dismiss
Without Prejudice 1, ECF No. 43.

This Court allowed the Delanos to amend their motion to
dismiss and denied the original motion as moot.  See Order, Aug.
29, 2012, ECF No. 47.  On September 28, 2012, this Court heard
oral argument on Abbott's motion for summary judgment and the
Delanos' amended motion to dismiss.  Clerk's Notes, Sept. 28,
2012, ECF No. 50.  After hearing oral argument, this Court denied
Abbott's motion for summary judgment and granted the Delanos'
motion to dismiss.  Order, Sept. 28, 2012, ECF No. 51.

This opinion further explains the Court's rationale for
denying Abbott's summary judgment motion.  See Fed. R. Civ. P.
56(a) ("The court should state on the record the reasons
for . . . denying the motion.").  When denying in its entirety a
motion for summary judgment, I usually ignore this exhortation,
as writing takes time and causes delay - the bane of the federal
judicial system.  I prefer instead the admonition of my great

colleague, Judge Joseph Tauro: "What part of the word 'denied' don't you understand?"  See also D. Brock Hornby, Summary Judgment Without Illusions, 13 Green Bag 2d 273, 288 (2010) ("[W]hen in doubt on facts or their inferences, judges should 'just say no.'").  As will be seen, however, in this case an opinion is warranted.

## B.   Undisputed Facts

Abbott's drug Humira is in a class of biologic drugs known as "TNF-alpha blockers" or TNF-inhibitors, Def.'s Facts ¶¶ 4, 19, and the FDA approved Humira for the treatment of psoriatic arthritis in January 2008, id. ¶ 5.  In October 2008, Delano's physicians prescribed Humira to treat his psoriatic arthritis, and he received Humira treatment approximately every two weeks for two and a half months.  Id. ¶ 6.  Delano took Humira along with another drug called methotrexate.[1]  Compl. ¶ 30.  In December 2008, Delano began experiencing flu-like symptoms and stopped using Humira.  Def.'s Facts ¶ 7.  "In early February 2009, [he] was admitted to the VA [Veterans Affairs] hospital, underwent tests, and later was admitted to St. Francis Hospital." Id. ¶ 8.

At St. Francis, Delano was diagnosed with "disseminated histoplasmosis," a fungal infection that had spread throughout

---

[1] Methotrexate is a mild immunosuppressant.  Methotrexate, available at http://www.med.unc.edu/gi/ibd/images/treatment -of-crohns/Methotrexate.pdf.

4

the body. Id. ¶¶ 8, 9. The histoplasma fungus is prevalent in the Mississippi Valley region, where eighty to ninety percent of the public is exposed to the fungus. Id. ¶ 10. The Delanos allege that Abbott had not warned Delano's physicians about the "very high risk of histoplasmosis, particularly in the Mississippi River Valley" or the additional risk of histoplasmosis posed by taking Humira with methotrexate. Id. ¶ 11.

When Delano was prescribed Humira, Humira bore a label which had been approved by the Food and Drug Administration ("FDA") on February 21, 2008. Id. ¶ 14. The label included a "black box" warning that warned of the risk of serious invasive fungal infections, and the "Warnings and Precautions" section of the label mentioned histoplasmosis as a possible infection. Id. ¶¶ 15-16. This section also noted that "serious infections have occurred in patients on concomitant immunosuppressive therapy." Id. ¶ 16. The patient insert of the February 21, 2008, label also mentioned the risk of histoplasmosis and severe fungal infection as among "the most important information [that a patient] should know about HUMIRA." Id. ¶ 18. In early September 2008, before Delano's February 2009 histoplasmosis diagnosis, the FDA had issued a press release regarding the risk of histoplasmosis associated with TNF-inhibitors, noting that it was requiring safety-related label changes for those drugs,

5

including Humira. Id. ¶¶ 19, 20; Compl., Ex. B., FDA News
Release, ECF No. 1-2.

In a September 4, 2008, letter, the FDA notified Abbott "of
new safety information [it] believe[d] should be included in the
labeling for Humira . . . and which pertains to the risk of
histoplasmosis with the use of the class of TNF-inhibitors."
Def.'s Facts ¶ 22 (first and second alterations in original)
(quoting Abbott Mot. Summ. J., Ex. 2, Letter from Bob A.
Rappaport, Dir., Div. Of Anesthesia, Analgesia, and Rheumatology
Prods., FDA, to Bryan Peterson, Assoc. Dir., Global Pharm.
Regulatory Affairs, Abbott ("FDA Letter") 1, ECF No. 9-5)
(internal quotation marks omitted). Abbott claims that the
Humira label was revised in December 2008 in response to the
FDA's request, id. ¶ 21, but the Delanos dispute whether the
revised label was distributed or made available to doctors and
patients, Pls.' Facts ¶ 21.

On February 2, 2009, a nurse's phone record notes that
Delano "[s]topped his humira recently as he thought it wasn't
working and possibly making him worse." Def.'s Facts ¶ 26
(alteration in original) (quoting Abbott Mot. Summ. J., Ex. 3,
Veteran Affairs Medical Records ("Medical Records") FD 10001013)
(internal quotation marks omitted). Delano's medical record from
February 2, 2009, indicates that he said he "ha[d] been feeling
dizzy and unsure of himself. . . . [was] having difficulty

6

sleeping, diarrhea, headaches and nausea and poor appetite. . . .
[and] thinks (sic) is reaction to his medication Humira." Id. ¶
27 (quoting Medical Records FD0001001) (internal quotation marks
omitted). Discharge instructions on February 8, 2009, in
Delano's medical records instruct, "[s]top taking the following:
methotrexate and adalimumab [Humira]. . ." Id. ¶ 29 (alterations
in original) (quoting Medical Records FD0000914) (internal
quotation marks omitted). A physician's note from February 25,
2009, states: "Pt. [Delano] here today with wife states he is to
take sporonox now for next 6 months. States this illness
occurred after he started taking humara (sic) for his psoriatic
arthritis last fall." Id. ¶ 30 (second alteration in original)
(quoting Medical Records FD0000905-06) (internal quotation marks
omitted).

The first communication between Arnold Vickery ("Vickery"),
the Delanos' counsel, and Abbott's counsel about the Delanos'
claims occurred in May 2010. Id. ¶ 34. Thereafter, the Delanos
claim that "[p]ursuant to an agreement between the parties, the
statute of limitations was tolled." Id. ¶ 32 (alteration in
original) (quoting Compl. ¶ 6) (internal quotation marks
omitted). The Delanos claim that this "informal tolling
agreement" was "extended several times," including in an email
written on November 15, 2010, from John Donley ("Donley"), then-
lead counsel for Abbott. Pls.' Facts ¶ 53; Pls.' Facts, Ex. 3,

7

Email from Donley, Partner, Kirkland & Ellis LLP, to Vickery,

Partner, Perdue Kidd & Vickery (Nov. 15, 2010, 9:10 AM) ("Abbott

Email"), ECF No. 25-2.  Consequently, Vickery believed that

Abbott would not assert limitations on the Delanos' claims.

Pls.' Facts ¶ 53.  Specifically, Vickery wrote to Donley on

November 12, 2010:

> John, Karin is nudging me on tolling expirations on
> Delano, Allen, Schmidt, Dominguez, and Pletan.[2]
> Meanwhile, we are sending letters today and/or Monday
> with time limits to 12/10 on a couple of our outstanding
> demands.
>
> If you think that 1/31/11 is enough time, would you
> please confirm tolling on these claims until that date?
> Thanks.
>
> Andy [Vickery]

Pls.' Facts, Ex. 3, Email from Vickery, Partner, Perdue Kidd &

Vickery to Donley, Partner, Kirkland & Ellis, LLP (Nov. 12, 2010,

5:15 PM) ("Vickery Email"), ECF No. 25-2.  Donley replied, "I

understood from our previous discussion that no claim was being

asserted by Dominguez.  Extension of the previous tolling

agreement regarding statute of limitations, until January 31,

2011, on all of the other cases mentioned below is hereby agreed

by Abbott."  Abbott Email.  The Delanos suggest that this email

supports their contention that Abbott waived the statute of

---

[2] Vickery represents various clients with claims against
Abbott related to their use of Humira.  Pls.' Resp. Opp'n
Abbott's Mot. Summ. J., Ex. A, Rule 56.1(d) Aff. Counsel ¶ 3, ECF
No. 23-1.

limitations. See Pls.' Facts ¶¶ 42, 53. They claim that unlike a tolling agreement between Abbott and another plaintiff represented by Vickery, the informal agreement referenced in Donley's email did not limit or impose conditions on Abbott's waiver of the statute of limitations defense. See id. ¶¶ 35, 42, 53. Further, in two other cases, Vickery claims that Abbott, through Donley, agreed to waive the limitations defense if the plaintiffs in those cases consented to Abbott's choice of forum. Id. ¶ 43. Donley and an Abbott executive met with the Delanos and interviewed them on June 23, 2010; the Delanos claim that Donley acknowledged that Abbott benefitted from not having lawsuits filed yet because suits can "generate bad publicity or attract other litigants." Id. ¶ 40. Both sides initially agreed that September 30, 2010, would be an appropriate date to have settlement discussions, but decided that the "informal process" would take longer. Id. ¶ 41. According to the Delanos, Donley made a monetary settlement offer in late November or early December 2010. Id. ¶ 44. During this time period, Donley also indicated that Abbott wanted to resolve claims like those brought by the Delanos on a pre-suit basis. Id. "Nothing was said about any potential statute of limitations issue affecting valuation of the case." Id. In May 2011, Donley introduced Vickery to Abbott's new lead counsel for the case. Id. ¶ 52. The Delanos

9

filed this personal injury product liability action on June 12,
2011. Def.'s Facts ¶ 1.

## C. **Federal Jurisdiction**

This Court has diversity jurisdiction over this case under
28 U.S.C. § 1332. The Delanos are residents and citizens of
Tennessee, and Abbott is an Illinois corporation with its
principal place of business in Abbott Park, Illinois. Compl. ¶¶
3-4. The amount in controversy is substantially more than
$75,000. Id. ¶ 5.

## II. **ANALYSIS**

### A. **Legal Standard**

Summary judgment is appropriate where the movant shows that
"there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). A factual dispute is "genuine" if a reasonable trier
of fact could find for the non-moving party based on the
evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986). A fact is "material" if it can affect the outcome of the
case under governing law. Id. "The evidence of the non-movant
is to be believed, and all justifiable inferences are to be drawn
in his favor." Id. at 255. The moving party bears the burden of
showing that no genuine issue of material fact exists. Celotex
Corp. v. Catrett, 477 U.S. 317, 330 (1986) (Brennan, J.,
dissenting) (citing 10A Charles Alan Wright et al., Federal
Practice and Procedure § 2727 (2d ed. 1983)). Except for facts

admitted by both parties, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000). Thus, on issues as to which the moving party bears the burden of proof, the Court will disregard evidence, even if unchallenged, favorable to the moving party that the jury is free to reject. See id.

## B. Application of Tennessee's Statute of Limitations for Product Liability Claims

The Delanos bring three claims against Abbott: strict liability, Compl. ¶¶ 81-84, negligence, id. ¶ 85, and breach of warranty, id. ¶ 86. Tennessee has a statute of limitations and statute of repose that apply to all product liability actions. Greene v. Brown & Williamson Tobacco Corp., 72 F. Supp. 2d 882, 886 (W.D. Tenn. 1999) (McCalla, J.); see Tenn. Code Ann. § 28-3-104 (statute of limitations); Tenn. Code Ann. § 29-28-103 (statute of repose). As defined by statute, product liability actions can be brought for personal injury, death, or property damage arising out of a wide range of activities, including the manufacture, warning, marketing, packaging, or labeling of any product. Tenn. Code Ann. § 29-28-102(6).

Product liability action includes, but is not limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever . . . .

11

Id. (internal quotation marks omitted). Accordingly, all of the
Delanos' claims are covered product liability actions under
Tennessee law.

Product liability actions "shall be commenced within one (1)
year after the cause of action accrued." Id. § 28-3-104(a). In
product liability cases, "the cause of action for injury to the
person shall accrue on the date of the personal injury, not the
date of the negligence or the sale of a product." Id. § 28-3-
104(b)(1). "The statute of limitations commences to run when the
plaintiff knows or has reason to know of the injury which is the
basis of his action." Ball v. Union Carbide Corp., 385 F.3d 713,
721 (6th Cir. 2004) (quoting Sevier v. Turner, 742 F.2d 262, 273
(6th Cir. 1984)) (internal quotation marks omitted). "A
plaintiff has reason to know of his injury when he should have
discovered it through the exercise of reasonable diligence." Id.
(quoting Sevier, 742 F.2d at 273) (internal quotation marks
omitted). The Delanos' claims are thus subject to a one-year
statute of limitations. See Tenn. Code Ann. § 28-3-104.

Abbott argues that because Delano knew he was ill and
believed his illness was caused by Humira on February 2, 2009,
his claims accrued then, at the latest. Abbott Mem. 11. Thus,
because the Delanos filed suit in June 2011 - over a year after
their claims expired in February 2010 - their claims are time-
barred. Abbott Mem. 12. The Delanos argue that the accrual of
their claims does not matter as Abbott waived the statute of

12

limitations through counsel, pointing to the November 2010 email from Donley, Abbott's counsel.[3]  Pls.' Mem. 7.

## C.    Impact of Tolling Agreement on Abbott's Statute of Limitations Defense

In diversity of citizenship actions, "state law defines the nature of defenses." Montgomery v. Wyeth, 580 F.3d 455, 468 n.7 (6th Cir. 2009).  Unlike a statute of repose, the statute of limitations can be waived. Hayes v. Gen. Motors Corp., No. 95-5713, 1996 WL 452916, at *4 (6th Cir. Aug. 8, 1996) (per curiam) ("The running of a statute of limitations nullifies a party's remedy, and, as such, it is a procedural mechanism and may be waived." (quoting Bruce v. Hamilton, 894 S.W.2d 274, 276 (Tenn. Ct. App. 1993))).  "A statute of limitation may be waived by

---

[3] The Delanos also argue that the statute of limitations did not start to run in February 2009 because the limitations period does not commence until a plaintiff knows not only of his injury, but also of any wrongdoing or fault of the party causing injury. Pls.' Resp. Opp'n Abbott's Mot. Summ. J. 1-2, ECF No. 23.  Thus, while Delano suspected that Humira made him sick in February 2009, he was not aware of any wrongdoing at that time.  This argument, however, is not convincing.  The FDA issued a press release discussing its ordering stronger warnings about the risk of fungal infections associated with Humira and other TNF-inhibitors in September 2008, before Delano started taking Humira.  Def.'s Facts ¶ 19; Reply 9-10; FDA News Release.  The FDA's press release received a "spate of national and local publicity."  Reply 10.  Delano's belief that Humira caused his histoplasmosis in February 2009, coupled with recent media coverage alerting the public to Humira's inadequate warning, is likely sufficient to have put Delano on notice of Abbott's potential wrongdoing, and thus, for his cause of action to accrue.  See Ball, 385 F.3d at 722-23 (noting that plaintiff has duty to inquire into cause of injury once he or she becomes aware of medical condition and deciding that plaintiff is charged with knowledge of potential personal injury claim where media or public record discussed defendant's connection to injury).

express contract or by necessary implications, or its benefits may be lost by conduct invoking the established principles of estoppel in pais." City of Kingsport v. SCM Corp., 352 F. Supp. 287, 288 (E.D. Tenn. 1972). In general, the waiver of a legal right requires "a clear, unequivocal, and decisive act of the party showing such a purpose, or acts amounting to an estoppel on his part." Jenkins Subway, Inc. v. Jones, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998) (quoting Charleston, S.C., Mining & Mfg. Co. v. Am. Agric. Chem. Co., 150 S.W. 1143, 1146 (Tenn. 1911)) (internal quotation mark omitted). A waiver can be proven by express declaration, acts, or a course of conduct reflecting an intent not to claim an advantage. Id. (quoting Baird v. Fidelity-Phenix Fire Ins. Co., 162 S.W.2d 384, 389 (Tenn. 1942)). A party claiming waiver must prove it by a preponderance of the evidence. Id.

The Delanos claim that Abbott waived the statute of limitations, as evinced in an email in which Abbott's counsel extends a "previous tolling agreement regarding the statute of limitations[] until January 31, 2011." Abbott Email. The Delanos initiated this action on June 12, 2011 – within the period during which the parties' agreement tolled the statute of limitations. Def.'s Facts ¶ 1.

Even so, Abbott argues that the tolling agreement cannot save the Delanos' claims because the Delanos first contacted Abbott about their claims in May 2010, which is three months

14

after the one-year limitations period had run. Reply 1-2; see Pls.' Facts ¶ 37. Thus, any purported tolling agreement cannot save claims that were already expired at the time that the agreement was reached. Reply 3.

It does not follow, however, that a tolling agreement cannot save an expired claim. In Tennessee, defendants can agree to waive the statute of limitations through tolling agreements. Tenn-Fla Partners v. Shelton, 233 S.W.3d 825, 829 (Tenn. Ct. App. 2007). A tolling agreement is a contract, and courts must ascertain the parties' intent in interpreting such agreements. Id. (noting that tolling agreement is governed by contract law); see, e.g., Monaco v. Bear Stearns Cos., No. CV 09-05438 SJO (JCx), 2011 WL 4059801, at *14 (C.D. Cal. Sept. 12, 2011) (observing that courts generally treat tolling agreements as contract); Joyce v. DLA Piper Rudnick Gray Cary LLP, 382 Ill. App. 3d 632, 636 (2008) (using "well-established contract principles" to interpret tolling agreement). Thus, the terms of tolling agreements, interpreted under contract principles, determine whether time-barred claims are revived. See, e.g., United States v. Hitachi Am., Ltd, 172 F.3d 1319, 1334 (Fed. Cir. 1999) (concluding that defendant had waived limitations period for both expired and unexpired claims where parties' agreement stated that "[defendant] will not assert any statute of limitations defense in any action"); SPPI-Somersville, Inc. v. TRC Cos., Nos. C 04-2648 SI, 07-5824 SI, 2009 WL 2390347, at *6,

15

*7 (N.D. Cal. Aug. 3, 2009) (rejecting defendant's argument that tolling agreement is "irrelevant" because limitations period had already expired when agreement was executed and holding that agreement tolled statute of limitations on expired claims because it specified that limitations period was tolled as of an earlier date, not date of agreement); Union Bank of Switz. v. HS Equities, Inc., 457 F. Supp. 515, 520-21 (S.D.N.Y. 1978) (holding that plaintiff's claims were timely where parties agreed to extend statute of limitations, including for a claim that had been time-barred for over a year when agreement was signed, because of agreement's "broad and plain language" that applied extension to "any claims," id. at 521). A federal district court, applying Tennessee law, held that a tolling agreement did not revive expired claims where the agreement, by its own terms, stated that it "shall not be deemed to revive any claims that are already time-barred by the time of the Agreement." O'Boyle v. Shulman, No. 3:09-CV-169, 2010 WL 1408444, at *1 (E.D. Tenn. Apr. 4, 2010) (internal quotation mark omitted).

Here, the Delanos point to a written email from Abbott's counsel that purports to toll the statute of limitations on their claims, extending the time to file suit from a prior tolling agreement. Abbott Email. Specifically, Vickery, the Delanos' counsel, wrote Abbott's counsel to "confirm tolling" on claims in four cases, including the Delanos' case. Vickery Email. Abbott's counsel responded, "I understood from our previous

16

discussion that no claim was being asserted by Dominguez. Extension of the previous tolling agreement regarding statute of limitations, until January 31, 2011, on all of the other cases mentioned below is hereby agreed by Abbott." Abbott Email (emphasis added). The extension does not limit the claims to which it applies, and the email is consistent with the Delanos' position that Abbott had previously waived the statute of limitations defense for a specific time frame in an informal tolling agreement reached by Abbott's counsel and Vickery. See Pls.' Facts ¶ 42; Anderson, 477 U.S. at 255 (noting that court must draw all reasonable inferences in favor of non-moving party on summary judgment motion); Tenn-Fla Partners, 233 S.W.3d at 829 (commenting that tolling agreements can waive statute of limitations defense).

Further, asserting that a claim is time-barred by the statute of limitations is an affirmative defense. See Mills v. Fulmarque, Inc., 360 S.W.3d 362, 365 (Tenn. 2012). So, in a pre-discovery summary judgment motion based on an affirmative defense, Abbott, the moving party, has a higher evidentiary burden than merely showing that the Delanos, the non-moving party, cannot sustain their burden of proof at trial. Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 487-88 (1984)). Rather, Abbott must demonstrate that "no reasonable

17

trier of fact could find other than for the moving party." Id.
(quoting Schwarzer, supra, at 259); see also Celotex, 477 U.S. at
331 (Brennan, J., dissenting) (noting that where party moving for
summary judgment bears burden of persuasion at trial, "that party
must support its motion with credible evidence . . . that would
entitle it to a directed verdict if not controverted at trial");
Arvest Bank v. Byrd, 814 F. Supp. 2d 775, 792 (W.D. Tenn. 2011)
(Mays, Jr., J.) (observing that movant with burden of persuasion
at trial must make stronger showing at summary judgment and
introduce evidence that would "conclusively establish" movant's
right to judgment after trial if nonmovant fails to rebut
evidence, id. (quoting 11 James William Moore, Moore's Federal
Practice § 56.13[1], at 56-162 (3d. ed. 2010))) (emphasis added).
Abbott has not met this higher evidentiary burden; it has failed
to rebut evidence suggesting that it agreed to waive the statute
of limitations defense through January 31, 2011, on all of the
Delanos' claims. See Def.'s Facts ¶¶ 32-36; Abbott Email. Thus,
a fact finder should determine the scope of the parties' tolling
agreement. See Solomon v. Open Hearth Rest., Inc., 1985 WL 4823,
at *1 (Tenn. Ct. App. Dec. 31, 1985) ("Generally speaking, the
tolling of the statute of limitations is a question of fact to be
submitted to the trier of facts." (citing City of Kingsport, 352
F. Supp. at 288)).

Accordingly, because Abbott bears the burden of proof on the
statute of limitations defense, save for the Delanos' admissions,

18

se

Case 2:11-cv-02475-WGY-cgc   Document 56   Filed 12/06/12   Page 19 of 23   PageID 628

this Court has disregarded the evidence proffered by Abbott, even

if uncontradicted, because the jury would be free to disregard

it. See Reeves, 530 U.S. at 151.[4]

---

[4] This approach is in tension with W.D. Tenn. Local Rule
56.1(d) which, like many districts' local rules, provides:

> Failure to respond to a moving party's statement of
> material facts, or a non-moving party's statement of
> additional facts, within the time periods provided by
> these rules shall indicate that the asserted facts are
> not disputed for purposes of summary judgment.

W.D. Tenn. Local R. 56.1(d). While sitting as a visiting
judge in the Southern District of New York, I had occasion
to analyze the discord between districts' local rules and
Supreme Court precedent. Seitz v. DeQuarto, 777 F. Supp. 2d
492, 494 n.2 (S.D.N.Y. 2011). That analysis applies here.
        As a visiting judge, I am, of course bound by the
district's local rules. Still, the approach set out in the
text above appears mandated by Supreme Court precedent.
        Fortunately, resolution of this tension is not outcome
determinative in this case. Nevertheless, it is appropriate
to observe that use of this "point-counterpoint" system has a
tendency, wherever the moving party bears the burden of proof,
to shift to the non-moving party a burden of production
inconsistent with the law's allocation of the burden of proof.
        Today, in the wake of Bell Atlantic Corporation v.
Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S.
662 (2009), I am reminded of Judge Patricia M. Wald's
prescient comments made more than a dozen years ago:

> [I]t seems clear that summary judgment gives
> judges more opportunities and power to make
> law . . . . My review of the D.C. Circuit's
> summary judgment rulings over a six-month
> period suggests that judges will stretch to
> make summary judgment apply even in borderline
> cases which, a decade ago, might have been
> thought indisputably trial-worthy. It also
> suggests that appellate courts will, by and
> large, uphold these dispositions, unless they
> think the trial judge got the law wrong. The
> upshot is that only plaintiffs who can put
> together strong cases without conducting
> discovery have a clear shot at reaching trial.

Their pleadings must (notwithstanding the permissive language of Rule 8) provide factual evidence sufficiently detailed to enable them to withstand motions to dismiss or for judgment on the pleadings or for summary judgment. Discovery, despite Rule 56(f), may be withheld, unless they can justify it in terms of the likelihood that it will yield crucial evidence.

None of this sounds or feels like what the Federal Rules of Civil Procedure say. . . . Rough justice may well be taking place in the corner-cutting practice I have described — the system may be surviving by weeding out marginal cases that would exact from the courts as well as the litigants costly and useless resources if permitted to go to trial. But that judgment ought to be made more openly, by changes to Rule 56, rather than covertly.

And one must at least think about the implications of the new regime, in which law is mostly made on the basis of undisputed facts "pleaded," "stipulated," or "inferred" rather than on fuller trial records that may more accurately represent the complexity and ambiguity of life. Will our law be less sensitive to the multivalenced and perspectival qualities of human events? Will our jurisprudence craft rules and principles and hand them down fully formed from the netherworld of law school hypotheticals, instead of forging them in the heat of pitched battle and hammering them into shape on the anvil of trials, witnesses, cross-examinations, and live evidence evaluated by ordinary lay persons? Will our law come to be characterized more by clear directives than by the balancing formulas so deplored by academics, but arguably superior in their ability to effect justice in the individual case?

. . . .

Ironically, as more cases are resolved by summary judgment, more law is created, because

20

> fewer cases will exit the system by reason of
> the plaintiff's inability to show the facts
> necessary to entitle them to a legal remedy
> under existing law. . . . The disposal of
> cases without trial ends the <u>cases</u> quickly,
> but creates <u>law</u> which persists . . . [J]udges
> need not even explain their reasons for
> granting summary judgment (though most do),
> even though they must provide findings of fact
> and conclusions of law in bench trials. The
> more reflexively summary judgment is used, the
> less the goal of discovering the truth — or
> even the reality — of particular disputes
> remains at the forefront of the civil
> litigation process. The name of the game in
> the emerging no-trial regime is quickly
> amassing enough evidence to support a legal
> theory on summary judgment.
>      Another ironic implication of the spread
> of summary judgment is that, even as our law
> enjoys a growth spurt quantitatively, it is
> enfeebled from growing in a more meaningful,
> qualitative sense. With summary judgment
> ruling the roost, the prototypical mode of
> lawmaking involves applying legal principles
> to incomplete, often anemic, factual
> scenarios. The complexity of real-life
> situations, which require judges to recognize
> the ways in which existing legal principles
> may not account for the multifarious
> possibilities of life — and accordingly to
> adjust or temper the law as necessary — risks
> going by the book. If Oliver Wendell Holmes
> was right when he said that "[t]he life of the
> law has not been logic: it has been
> experience," then the decoupling of law from
> experience could strike a mortal blow to its
> integrity; our law would not disappear, but it
> could become lifeless, like a whale washed up
> on the beach.

Patricia M. Wald, <u>Summary Judgment at Sixty</u>, 76 Tex. L.
Rev. 1897, 1942-44 (1998) (eighth alteration in original)
(emphases added) (footnotes omitted) (quoting Oliver
Wendell Holmes, Jr., <u>The Common Law</u> 11 (Little, Brown &
Co. reprint) (Mark D. Howe ed., Harvard Univ. Press 1963)
(1st ed. 1881)).

## III. CONCLUSION

For the foregoing reasons, this Court denied Abbott's

summary judgment motion.

**IT WAS SO ORDERED** the 28th day of September 2012.

---

This dire state of affairs is exacerbated in cases in which judicially crafted doctrines intersect with summary procedures to eviscerate further the role of fact-finding in litigation and adjudication. See Goutam U. Jois, Pearson, Iqbal, and Procedural Judicial Activism, 37 Fla. St. U. L. Rev. 901, 901 (2010) ("Iqbal takes away the district court's ability to manage litigation (by using procedures explicitly provided in the Federal Rules and previously approved by the U.S. Supreme Court) in order to shield public officials, relying instead on the rather blunt instrument of dismissing the case entirely."); id. at 943 ("Iqbal restricts courts' discretion to carefully manage litigation, thus forcing them to dismiss claims outright when in the past some targeted or limited discovery might have preserved the claims.")

In the employment discrimination area, see Nancy Gertner, Loser's Rules, 122 Yale L.J. Online 109 (2012), http://yalelawjournal.org/2012/10/16/gertner.html.

Regrettably, those of us in the judiciary appear not to be getting the message — or we don't care. See Arthur R. Miller, From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure, 60 Duke L.J. 1 (2010); Arthur Miller, The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?, 78 N.Y.U. L. Rev. 982 (2003); William G. Young, A Lament for What Once Was and Yet Can Be, 32 B.C. Int'l & Comp. L. Rev. 305, 312–18 (2009). Judges must remember that "[t]he affidavit is the Potemkin Village of today's litigation landscape. Purported adjudication by affidavit is like walking down a street between two movie sets, all lawyer-painted facade and no interior architecture." United States v. Massachusetts, 781 F. Supp. 2d 1, 22 n.25 (D. Mass. 2011).

I've reached the conclusion that the eclipse of fact-finding foreshadows the twilight of judicial independence. Nevertheless, I am sworn to soldier on and apply the law of the Supreme Court and the Sixth Circuit to the undisputed facts in this record.

William G. Young
U.S. District Judge

Dated December 6, 2012.

23